# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **JANICE NELSON AND VICKIE HENLEY, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,** | ) ) ) | |
| | ) | **CASE NO. _____** |
| **PLAINTIFFS,** | ) | |
| | ) | |
| **V.** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **QUALDERM PARTNERS, LLC,** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

## COMPLAINT — CLASS ACTION

Plaintiffs Janice Nelson and Vickie Henley, individually and on behalf of a class of similarly situated persons, bring this Class Action Complaint and allege the following against defendant QualDerm Partners, LLC ("QualDerm" or "Defendant"), based upon personal knowledge with respect to Plaintiffs, and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters.

### NATURE OF THE ACTION

1.     Plaintiffs bring this class action against QualDerm for its failure to properly secure Plaintiffs' and Class Members' personally identifiable information ("PII") and personal health information ("PHI") (collectively with PII, "Private Information").

2.     QualDerm failed to comply with industry standards to protect information systems that contain Private Information. Plaintiffs seek, among other things, orders requiring QualDerm to fully and accurately disclose the nature of the information that has been

compromised and to adopt sufficient security practices and safeguards to prevent incidents like the disclosure (the "Data Breach") in the future.

3.     QualDerm claims that its "experienced business professionals manage the operational and administrative tasks" for 158 dermatology practices in 17 states.

4.     On February 24, 2026, QualDerm disclosed to the Texas Attorney General that a data breach had affected nearly 175,000 people in Texas alone (the "Data Breach"). A notice on QualDerm's website disclosed that, for each patient at risk, the information involved might include their name, date of birth, doctor name, medical record number, date of death, email address, treatment information, diagnosis information, and health insurance information.

5.     As a health care provider, QualDerm knowingly obtained sensitive Private Information and had a resulting duty to securely maintain that information in confidence. Plaintiffs and Class Members would not have provided their Private Information to QualDerm if they had known that QualDerm would not ensure that it used adequate security measures.

6.     Plaintiffs seek to remedy these harms individually and on behalf of all other similarly situated individuals whose Private Information was exposed in the Data Breach. Plaintiffs seek remedies including compensation for time spent responding to the Data Breach and other types of harm, free credit monitoring and identity theft insurance, and injunctive relief, including substantial improvements to QualDerm's data security policies and practices.

## PARTIES

7.     Plaintiff Janice Nelson is a resident of Hermitage, Tennessee, and has been a patient at QualDerm affiliate Mount Juliet Pinnacle Dermatology for two to three years.

8.     Plaintiff Vickie Henley is a resident of Nashville, Tennessee, and has been a patient at QualDerm affiliate Mount Juliet Pinnacle Dermatology for several years.

2

9.     Defendant QualDerm Partners, LLC is a Delaware limited liability company, with its headquarters in Brentwood, Tennessee.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Minimal diversity exists because putative Class Members reside outside the State of Tennessee. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

11.     This Court has general personal jurisdiction over QualDerm because it is headquartered in and maintains its principal place of business in this District. 28 U.S.C. 1391(a). QualDerm is authorized to and regularly conducts business in Tennessee.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this District, a substantial part of the events giving rise to this action occurred in this District, and Defendant is subject to the Court's personal jurisdiction with respect to this action.

## FACTUAL ALLEGATIONS

### The Data Breach

13.     QualDerm operates a healthcare network based in Brentwood, Tennessee that provides operational and administrative services to dermatology practices, including Mount Juliet Pinnacle Dermatology. QualDerm claims that its services "empower[] top-tier dermatologists to position their practices for long-term, sustainable growth and enhanced profitability."[1]

---

[1] QualDerm, available at https://www.qualderm.com/ (last accessed on Feb. 27, 2026).

14.     Due to the nature of the services it provides, QualDerm acquires and electronically stores Private Information. QualDerm was therefore required to ensure that Private Information was not disclosed or disseminated to unauthorized third parties without Plaintiffs' and Class Members' express written consent.

15.     On February 24, 2026, QualDerm disclosed to the Texas Attorney General that a data breach had affected nearly 175,000 people in Texas alone.[2]

16.     Around the same time, QualDerm posted a "Notice of Data Privacy Event" on its website. That Notice disclosed that QualDerm discovered the breach on December 24, 2025, and that the information that might have been affected for each individual includes their "patient name, date of birth, doctor name, medical record number, date of death, email address, treatment information, diagnosis information, [sic] health insurance information."[3]

17.     QualDerm has not otherwise made any public statement as to the Data Breach.

18.     QualDerm's failure to disclose any additional information regarding the Data Breach is inimical to its patients' interests. QualDerm should be required to disclose why Private Information was stored on systems without adequate security, the deficiencies in the security systems that permitted unauthorized access, whether the data was encrypted or otherwise protected, and what QualDerm knows about the degree to which the data has been disseminated.

19.     Without such disclosure, questions remain as to the full extent of the Data Breach, the actual data accessed and compromised, and what measures, if any, QualDerm has taken to

_____

[2] Data Security Breach Reports, available at https://oag.my.site.com/ datasecuritybreachreport/apex/DataSecurityReportsPage (last accessed on Feb. 27, 2026).

[3] Notice of Data Privacy Event, available at https://www.qualderm.com/getmedia/ fb6151b7-897f-4ea7-8e6d-77b10603f25f/Qualderm-Notice-of-Data-Privacy-Event.pdf?_ gl=1*1uydf71*_gcl_au*MTM1NjY0NTYxLjE3NzIyMjMyNDY. (last accessed on Feb. 27, 2026).

secure the Private Information still in its possession. Plaintiffs seek to determine the scope of the Data Breach and the information involved, obtain relief that redresses the harm to Plaintiffs' and Class Members' interests, and ensure that QualDerm has proper measures in place to prevent similar incidents from occurring in the future.

**QualDerm's Security Representations**

20. QualDerm's website includes a "Notice of Privacy Practices," which "describes how medical information about [its patients] may be used and disclosed."[4] The Notice acknowledges that QualDerm is "required by law to … make sure that the protected health information about you is kept private" and "follow the conditions of the Notice that is currently in effect."[5]

21. The Privacy Statement also identifies over a dozen circumstances under which QualDerm may disclose patients' Private Information, and claims that "[o]ther uses and disclosures of medical information not covered by this notice or the laws that apply to us will be made only with your written permission."[6] None of that material accounts for the disclosure of Private Information to cyber-criminals.

**The Healthcare Sector is a Primary Target for Data Breaches**

22. QualDerm was on notice that companies in the healthcare industry are susceptible targets for data breaches.

23. QualDerm was also on notice that the Federal Bureau of Investigation has been concerned about data security in the healthcare industry. On April 8, 2014, the FBI's Cyber

---

[4] Notice of Privacy Practices, available at https://www.qualderm.com/notice-of-privacy-practices (last accessed Feb. 27, 2026).

[5] *Id.*

[6] *Id.*

Division issued a Private Industry Notification to companies within the healthcare sector, stating that "the health care industry is not technically prepared to combat against cyber criminals' basic cyber intrusion tactics, techniques and procedures (TTPs), much less against more advanced persistent threats (APTs)" and pointed out that "[t]he biggest vulnerability was the perception of IT healthcare professionals' beliefs that their current perimeter defenses and compliance strategies were working when clearly the data states otherwise." The same warning specifically noted that "[t]he FBI has observed malicious actors targeting healthcare-related systems, perhaps for the purpose of obtaining Protected Health Information (PHI) and/or PII."[7]

24.     The number of reported North American data breaches increased by over 50 percent in 2021, from 1,080 in 2020[8], to 1,638 in 2021.[9] As a recent report reflects, "[h]ealthcare has increasingly become a target of run-of-the-mill hacking attacks and the more impactful ransomware campaigns."[10]

25.     At the end of 2018, the healthcare sector ranked second in the number of data breaches among measured sectors, and had the highest rate of exposure for each breach.[11] Indeed, when compromised, healthcare related data is among the most sensitive and personally

---

[7] Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain (Apr. 8, 2014), FBI Cyber Division Private Industry Notification (available at https://info.publicintelligence.net/FBI-HealthCareCyberIntrusions.pdf) (last accessed Feb. 27, 2026).

[8] See Verizon 2021 Data Breach Investigations Report, at 97, https://www.verizon.com/ business/resources/reports/2021-data-breach-investigations-report.pdf (last accessed Feb. 27, 2026).

[9] See Verizon 2022 Data Breach Investigations Report, at 83 (available at https://www.verizon.com/ business/resources/reports/2022/dbir/2022-data-breach-investigations-report-dbir.pdf) (last accessed Feb. 27, 2026).

[10] Id. at 62.

[11] 2018 End-of-Year Data Breach Report, Identity Theft Resource Center (available at https://www.idtheftcenter.org/2018-data-breaches) (last accessed Feb. 27, 2026).

6

consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[12] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy.[13]

26.     Healthcare-related breaches have persisted because criminals see electronic patient data as a valuable asset. According to the 2019 HIMSS Cybersecurity Survey, 82 percent of participating hospital information security leaders reported having a significant security incident in the previous 12 months, with a majority of these known incidents being caused by "bad actors" such as cybercriminals.[14] "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[15]

---

[12] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010) (available at https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/) (last accessed Feb. 27, 2026).

[13] *Id.*

[14] *2019 HIMSS Cybersecurity Survey* (available at https://www.himss.org/sites/hde/files/d7/u132196/2019_HIMSS_Cybersecurity_Survey_Final_Report. pdf) (last accessed Feb. 27, 2026).

[15] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, Apr. 4, 2019 (available at https://www.idigitalhealth.com/news/how-to-safeguard-hospital-data-from-email-spoofing-attacks) (last accessed Feb. 27, 2026).

27.     The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[16]

28.     As a major healthcare services provider, QualDerm knew, or should have known, the importance of safeguarding Plaintiffs' and Class Members' Private Information entrusted to it and of the foreseeable consequences if that data was disclosed. This includes the significant costs that would be imposed on Plaintiffs and Class Members by virtue of a breach. QualDerm failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

29.     Moreover, QualDerm has been the victim of multiple cyberattacks that are very similar to the one that they are facing in this present lawsuit.

30.     On March 28, 2016, QualDerm discovered that it was the target of a ransomware attack when certain users could not log onto their system.[17] The pop up that appeared when employees tried to log in was a demand for 45 bitcoins in exchange for the release of the digital data.[18]

_____

[16] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, Am. Med. Ass'n (Oct. 4, 2019) (available at https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals) (last visited Feb. 27, 2026).

[17] Marianne K. McGee, *QualDerm Shuts Systems After Cyberattack*, InfoRisk Today, Mar. 29, 2016, https://www.inforisktoday.com/medstar-shuts-systems-after-cyberattack-a-8999 (accessed on Feb. 27, 2026).

[18] John Woodrow Cox, *QualDerm Health Turns Away Patients After Likely Ransomware Cyberattack*, Washington Post (Mar. 29, 2016), https://www.washingtonpost.com/local/medstar-health-turns-away-patients-one-day-after-cyberattack-on-its-computers/2016/03/29/252626ae-f5bc-11e5-a3ce-f06b5ba21f33_story.html.

8

31.     QualDerm decided to shut down their entire system and operated using paper records for at least five days as they tried to stop the virus from spreading.[19] The following year in 2017, the Maryland Health Care Commission issued a report on the state of the data breaches in the health care industry and named the QualDerm attack one of the "two high profile hacking incidents" in Maryland.[20]

32.     QualDerm Health has reported to the Department of Health and Human Services ("DHHS") Office for Civil Rights that they experienced a hacking incident of its network server on September 25, 2020. On May 3, 2024, the reported another incident to DHHS and sent a letter to almost 184,000 patients notifying them that their data may have been compromised due to unauthorized access of employee email accounts over the course of ten months.[21] The class action lawsuit that resulted was *Riddick v. QualDerm Health, Inc.*, Case No. 1:24-cv-01335-BAH. There is currently a proposal to settle the class action lawsuit where QualDerm is offering to compensate patients up to $5,000 per putative class member for a total of $1.5 million.[22]

---

[19] Marianne K. McGee, *QualDerm Shuts Systems After Cyberattack*, InfoRisk Today, Mar. 29, 2016, https://www.inforisktoday.com/medstar-shuts-systems-after-cyberattack-a-8999; Andrea McDaniels and Ian Duncan, *QualDerm Hack Shows Risks that Come with Electronic Health Records*, The Baltimore Sun (Aug. 19, 2019) (updated), https://www.baltimoresun.com/2016/04/02/medstar-hack-shows-risks-that-come-with-electronic-health-records/?clearUserState=true.

[20] Maryland Health Care Commission, Health Care Data Breaches: A Changing Landscape, 7-8 (June 2017), https://mhcc.maryland.gov/mhcc/pages/hit/hit/documents/HIT_DataBreachesBrief_Brf_Rpt_090717.pdf.

[21] Suzanne Smalley, *Nearly 184,000 QualDerm Health Patients' Personal Data Possibly Breached*, The Record (May 7, 2024), https://therecord.media/medstar-health-data-breach.

[22] *Riddick v. QualDerm Health, Inc.*, Case No. 1:24-cv-01335-BAH, Notice of Proposed Class Action Settlement, https://www.medstarhealth.org/-/media/project/mho/medstar/pdf/class-action-settlement-notice.pdf (accessed on Feb. 27, 2026).

**QualDerm Stores Plaintiffs' and Class Members' Private Information**

33.     QualDerm obtained and stored a massive amount of Private Information. As a condition of engaging in health care services, QualDerm and its affiliates required that patients entrust it with highly confidential Private Information.

34.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, QualDerm assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure.

35.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information, and relied on QualDerm to keep this information confidential and securely maintained, and to make only authorized disclosures of this information.

**Private Information is Valuable and Subject to Unauthorized Disclosure**

36.     QualDerm was aware that the Private Information it collected is highly sensitive and of significant value to those who would use it for wrongful purposes.

37.     Private Information is a valuable commodities to identity thieves. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud.[23] Indeed, a robust illegal market exists in which criminals openly post stolen Private Information on multiple underground websites, commonly referred to as the "dark web." PHI can sell for as much as $363 on the dark web, according to the

---

[23] Federal Trade Commission, What To Know About Identity Theft (available at https://consumer.ftc.gov/articles/what-know-about-identity-theft) (last accessed Feb. 27, 2026).

Infosec Institute.[24] Moreover, "fullz" packages, which include "extra information about [a] legitimate credit card owner in case" a scammer's "bona fides are challenged when they attempt to use the credit card" are also offered on the dark web.[25]

38.     PHI is particularly valuable because criminals can use it to target victims with frauds and swindles that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

39.     Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's PHI is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[26]

40.     The ramifications of QualDerm's failure to keep Plaintiffs' and Class Members' Private Information secure are long-lasting and severe. Once Private Information is stolen,

---

[24] Center for Internet Security, *Data Breaches: In the Healthcare Sector* (available at https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/) (last accessed Feb. 27, 2026).

[25] Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web, Armor (Apr. 3, 2018), https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud- dark-web/ (last accessed Feb. 27, 2026).

[26] Michael Ollove, The Rise of Medical Identity Theft in Healthcare, Kaiser Health News (Feb. 7, 2014) (available at https://khn.org/news/rise-of-indentity-theft/) (last accessed Feb. 27, 2026).

fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for months or even years thereafter.

41.     Further, criminals often trade stolen Private Information for years following a breach. Cybercriminals can post stolen Private Information on the internet, thereby making such information publicly available.

42.     Approximately 21% of victims do not realize their identity has been compromised until more than two years after it happens.[27] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[28]

43.     QualDerm knew, or should have known, the importance of safeguarding Private Information entrusted to it and of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be imposed on Plaintiffs and Class Members because of a breach. QualDerm failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

**The Data Breach Exposed Plaintiffs and Class Members
to Identity Theft and Out-of-Pocket Losses**

44.     Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of their rights. They are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

---

[27] *See* Medical ID Theft Checklist (available at https://www.identityforce.com/blog/medical-id-theft-checklist-2) (last accessed Feb. 27, 2026).

[28] Experian, The Potential Damages and Consequences of Medical Identity Theft and Healthcare Data Breaches (available at https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf) (last accessed Feb. 27, 2026).

12

45.     Despite all the publicly available knowledge of known and foreseeable consequences of the disclosure of Private Information, QualDerm's policies and practices with respect to maintaining the security of Plaintiffs' and Class Members' Private Information were reckless, or at the very least, negligent.

46.     In virtually all contexts, the expenditure of time has consistently been recognized as compensable, and for many people, it is the basis on which they are compensated. Plaintiffs and Class Members should be compensated for the time they have expended because of QualDerm's misfeasance.

47.     Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. Consumer victims of data breaches are more likely to become victims of identity fraud.[29]

48.     As a result of the wide variety of injuries that can be traced to the Data Breach, Plaintiffs and Class Members have and will continue to suffer financial loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a.   invasion of privacy;

b.   theft of their Private Information;

c.   lost or diminished value of their Private Information;

d.   lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach;

e.   loss of the benefit of their bargain;

---

[29]     2014 LexisNexis True Cost of Fraud Study (available at https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf) (last accessed Feb. 27, 2026).

13

f.   lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach;

g.   statutory damages;

h.   nominal damages; and

i.   the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in QualDerm's possession and is subject to further unauthorized disclosures so long as QualDerm fails to undertake appropriate and adequate measures to protect the Private Information.

**QualDerm's Lax Security Violates HIPAA**

49.   QualDerm had a non-delegable duty to ensure that all PHI it collected and stored was secure.

50.   QualDerm is bound by HIPAA (*see* 45 C.F.R. § 160.102) and, as a result, is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

51.   These rules establish national standards for the protection of patient information, including protected health information, defined as "individually identifiable health information" which either "identifies the individual" or where there is a "reasonable basis to believe the information can be used to identify the individual," that is held or transmitted by a healthcare provider. See 45 C.F.R. § 160.103.

14

52.     HIPAA limits the permissible uses of "protected health information" and prohibits unauthorized disclosures of "protected health information."

53.     HIPAA requires that QualDerm implement appropriate safeguards for this information.

54.     Despite these requirements, QualDerm failed to comply with its duties under HIPAA and their own Privacy Practices. In particular, QualDerm failed to:

a.  maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.  adequately protect Plaintiffs' and Class Members' PHI;

c.  ensure the confidentiality and integrity of electronic PHI created, received, maintained, or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

d.  implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

e.  implement adequate policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1)(i);

f.  implement adequate procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports, in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

g.  protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3);

15

h. ensure compliance with the electronic PHI security standard rules by their workforce, in violation of 45 C.F.R. § 164.306(a)(4); and/or

i. train all members of their workforce effectively on the policies and procedures with respect to PHI as necessary and appropriate for the members of their workforce to carry out their responsibilities and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b)

55.     QualDerm failed to comply with its duties under HIPAA despite being aware of the risks associated with unauthorized access to Plaintiffs' and Class Members' PHI.

**QualDerm Violated FTC Guidelines**

56.     The Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, prohibited QualDerm from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' PII is an "unfair practice" in violation of the FTC Act. *See, e.g., Fed. Trade Comm'n v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

57.     The FTC has promulgated several guides for businesses that reflect the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[30]

---

[30] Federal Trade Commission, Start With Security: A Guide for Business (available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf) (last accessed Feb. 27, 2026).

16

58.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established data security guidelines for businesses.[31] The guidelines reflect that businesses should protect the PII that they keep; properly dispose of PII that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

59.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to confidential data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[32]

60.     The FTC has brought enforcement actions against businesses for failing to protect customer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

61.     QualDerm failed to properly implement basic data security practices. QualDerm's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

---

[31] Federal Trade Commission, Protecting Personal Information: A Guide for Business (available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf) (last accessed Feb. 27, 2026).

[32] FTC, *Start With Security*, *supra*.

62.     QualDerm was at all times fully aware of its obligation to protect Plaintiffs' and Class Members' Private Information because of its position as a healthcare provider. QualDerm was also aware of the significant repercussions that would result from its failure to do so.

**Plaintiff Nelson's Experience**

63.     Plaintiff Janice Nelson has been a patient at QualDerm affiliate Mount Juliet Pinnacle Dermatology for two to three years.

64.     QualDerm obtained Ms. Nelson's Private Information in the course of conducting its regular business operations.

65.     At the time of the Data Breach, QualDerm retained Ms. Nelson's Private Information.

66.     In recent months, Ms. Nelson has experienced a fraudulent charge on her debit card, and has noticed an increase in her receipt of spam telephone calls.

67.     Ms. Nelson greatly values her privacy and is very careful about sharing her sensitive Private Information. Ms. Nelson diligently protects her Private Information, takes proactive steps to ensure her Private Information is kept safe and secure, and stores any documents containing Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the Internet or any other unsecured source.

68.     QualDerm obtained and continues to maintain Ms. Nelson's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

69.     The Data Breach has caused Ms. Nelson to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of criminals.

70.     As a result of the Data Breach, Ms. Nelson is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

71.     Ms. Nelson has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in QualDerm's possession, protected and safeguarded from future breaches.

**Plaintiff Henley's Experience**

72.     Plaintiff Vickie Henley has been a patient at QualDerm affiliate Mount Juliet Pinnacle Dermatology for several years.

73.     QualDerm obtained Ms. Henley's Private Information in the course of conducting its regular business operations.

74.     At the time of the Data Breach, QualDerm retained Ms. Henley's Private Information.

75.     In recent months, Ms. Henley has experienced an increase in her receipt of spam telephone calls and emails.

76.     Ms. Henley greatly values her privacy and is very careful about sharing her sensitive Private Information. Ms. Henley diligently protects her Private Information, takes proactive steps to ensure her Private Information is kept safe and secure, and stores any documents containing Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the Internet or any other unsecured source.

19

77.     QualDerm obtained and continues to maintain Ms. Henley's Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

78.     The Data Breach has caused Ms. Henley to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of criminals.

79.     As a result of the Data Breach, Ms. Henley is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

80.     Ms. Henley has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in QualDerm's possession, protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

81.     This civil action is properly maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4). Plaintiffs seek certification of the following class:

> All persons in the United States and its territories whose Private Information was compromised in the Data Breach.

82.     Excluded from the Class are QualDerm, any entity in which QualDerm has a controlling interest, and QualDerm's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class are any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff.

83.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class as additional information becomes available to Plaintiffs.

20

84.     **Numerosity:** The Class Members are so numerous that individual joinder of all Class Members is impracticable. Upon information and belief, the number of individuals whose Private Information was exposed by QualDerm is at least in the hundreds of thousands. All Class Members' names and addresses are available from QualDerm's records, and Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

85.     **Commonality:** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

     a.  Whether and to what extent QualDerm had a duty to protect the Private Information of Class Members;

     b.  Whether QualDerm was negligent in collecting and storing Plaintiffs' and Class Members' Private Information;

     c.  Whether QualDerm had duties not to disclose the Private Information of Class Members to unauthorized third parties;

     d.  Whether QualDerm took reasonable steps and measures to safeguard Plaintiffs' and Class Members' Private Information;

     e.  Whether QualDerm failed to adequately safeguard the Private Information of Class Members;

     f.  Whether QualDerm failed to implement and maintain reasonable security policies and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

g.  Whether QualDerm adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

h.  Whether Plaintiffs and Class Members are entitled to actual damages, statutory damages, and/or punitive damages because of QualDerm's wrongful conduct;

i.  Whether Plaintiffs and Class Members are entitled to restitution because of QualDerm's wrongful conduct;

j.  Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and ongoing harm they face because of the Data Breach; and

k.  Whether Plaintiffs and Class Members are entitled to identity theft protection for their respective lifetimes.

86.  **Typicality:** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was disclosed by QualDerm. Plaintiffs' claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through QualDerm's common misconduct. Plaintiffs are advancing the same claims and legal theories individually and on behalf of all other Class Members, and there are no defenses that are unique to Plaintiffs. Plaintiffs' claims and Class Members' claims arise from the same operative facts and are based on the same legal theories.

87.  **Adequacy:** Plaintiffs are adequate representatives of the Class because Plaintiffs are members of the Class and are committed to pursuing this matter against QualDerm to obtain relief for the Class. Plaintiffs have no conflicts of interest with the Class. Plaintiffs' counsel are competent and experienced in litigating class actions, including extensive experience in data breach litigation. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

88.     **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because QualDerm has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members, and making final injunctive relief appropriate with respect to the Class as a whole. QualDerm's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on QualDerm's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

89.     **Superiority:** Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like QualDerm. Even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

90.     The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because QualDerm would necessarily gain an unconscionable advantage in non-class litigation, since QualDerm would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could

23

unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by Class Members and will establish the right of each Class Member to recover on the causes of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

91.     The litigation of Plaintiffs' claims is manageable. QualDerm's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with maintenance of this lawsuit as a class action.

92.     Adequate notice can be given to Class Members directly using information maintained in QualDerm's records.

93.     Unless a class-wide injunction is issued, QualDerm may continue to maintain inadequate security with respect to the Private Information of Class Members, QualDerm may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and QualDerm may continue to act unlawfully as set forth in this Complaint.

94.     QualDerm has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate.

## FIRST CLAIM FOR RELIEF
### NEGLIGENCE
#### (on behalf of Plaintiffs and the Class)

95.     Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in the preceding paragraphs.

24

96. QualDerm owed a duty to Plaintiffs and Class Members to exercise reasonable care in safeguarding, securing, and protecting the Private Information in its possession, custody, or control.

97. QualDerm knew or should have known the risks of collecting and storing Plaintiffs' and Class Members' Private Information and the importance of maintaining and using secure systems. QualDerm knew or should have known of the many data breaches that have targeted companies that stored Private Information in recent years.

98. Given the nature of QualDerm's business, the sensitivity and value of the Private Information it maintains, and the resources at its disposal, QualDerm should have identified and foreseen that it could have vulnerabilities in its systems and prevented the dissemination of Plaintiffs' and Class Members' Private Information.

99. QualDerm also makes explicit statements on its website that it will follow privacy laws and regulations, and that it will use reasonable methods to protect the Private Information in its control.

100. QualDerm breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Private Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Private Information entrusted to it — including Plaintiffs' and Class Members' Private Information.

101. Plaintiffs and Class Members had no ability to protect their Private Information that was, or remains, in QualDerm's possession.

102.    It was or should have been reasonably foreseeable to QualDerm that its failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Private Information would result in the unauthorized release, disclosure, and dissemination of Plaintiffs' and Class Members' Private Information to unauthorized individuals.

103.    But for QualDerm's negligent conduct or breach of the above-described duties owed to Plaintiffs and Class Members, their Private Information would not have been compromised. The Private Information of Plaintiffs and Class Members was lost and accessed as the proximate result of QualDerm's failure to exercise reasonable care in safeguarding, securing, and protecting such Private Information.

104.    As a result of QualDerm's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Private Information; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their Private Information which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Private Information compromised as a result of the Data Breach; and (vii) loss of value of their Private Information, for which there is a well-established national and international market; and (viii) overpayment for services that were received without adequate data security.

## SECOND CLAIM FOR RELIEF
### NEGLIGENCE PER SE
### (on behalf of Plaintiffs and the Class)

105.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in the preceding paragraphs.

106.    Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the Federal Trade Commission ("FTC"), the unfair act or practice by companies such as QualDerm of failing to use reasonable measures to protect Private Information.

107.    QualDerm also had a duty under  FTC Act, 15 U.S.C. § 45 to provide adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

108.    Plaintiffs and Class Members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes) was intended to protect.

109.    QualDerm had a duty to Plaintiffs and Class Members to implement and maintain reasonable security procedures and practices to safeguard Plaintiffs' and Class Members' Private Information.

110.    QualDerm violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Private Information and not complying with industry standards. QualDerm's conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on its systems, and QualDerm's experience with previous breaches.

111.    QualDerm breached its duty to Plaintiffs and Class Members under the FTC Act by failing to provide reasonable or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

27

112.    The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of its failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and Class Members.

113.    But for QualDerm's wrongful and negligent breach of duty owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

114.    The injury and harm suffered by Plaintiffs and Class Members were the reasonably foreseeable result of QualDerm's breach of its duty. QualDerm knew or should have known that QualDerm was failing to meet its duties and that the breach would cause Plaintiffs and Class Members to suffer the foreseeable harms associated with the exposure of their Private Information.

115.    QualDerm's violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence per se.

116.    QualDerm is a covered entity under HIPAA (42 U.S.C. § 1302d, et seq.). As an entity covered by HIPAA, QualDerm had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' PHI.

117.    Plaintiffs and Class Members are within the class of persons that HIPAA was intended to protect.

118.    Under HIPAA, QualDerm had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 C.F.R. § 164.304 definition of encryption).

28

119. The harm that occurred as a result of the Data Breach is the type of harm that HIPAA was intended to guard against. The Federal Health and Human Services' Office for Civil Rights has pursued enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures relating to protected health information, caused the same harm as that suffered by Plaintiffs and Class Members.

120. QualDerm breached their duties to Plaintiffs and Class Members under HIPAA, by failing to provide reasonable or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PHI.

121. QualDerm's failures to comply with applicable laws and regulations constitute negligence per se.

122. But for QualDerm's wrongful and negligent breach of the duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

123. The injury and harm suffered by Plaintiffs and Class Members were the reasonably foreseeable result of QualDerm's breach of its duties. QualDerm knew or should have known that QualDerm was failing to meet its duties and that its breach would cause Plaintiffs and Class Members to suffer the foreseeable harms associated with the exposure of their Private Information.

124. QualDerm's violation of HIPAA constitutes negligence per se.

125. As a direct and proximate result of QualDerm's negligence per se, Plaintiffs and Class Members have suffered harm, including:

    a. losing the inherent value of their Private Information;

    b. having their private health information, including diagnoses and medications, exposed to people who they did not intend to disclose that information to;

c.  losing the value of the explicit and implicit promises of data security;

d.  identity theft and fraud resulting from the theft of their Private Information;

e.  costs and time associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

f.  costs and time associated with purchasing credit monitoring, credit freezes, and identity theft protection services;

g.  unreimbursed losses relating to fraudulent charges;

h.  losses relating to exceeding credit and debit card limits and balances; harm resulting from damaged credit scores and information; and

i.  other harm resulting from the unauthorized use or threat of unauthorized use of stolen Private Information, entitling them to damages in an amount to be proven at trial.

126.  Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

127.  Plaintiffs and Class Members are also entitled to injunctive relief requiring QualDerm to: (1) strengthen its data security systems and monitoring procedures; (2) submit to future annual audits of those systems and monitoring procedures; and (3) provide adequate credit monitoring to all Class Members.

## THIRD CLAIM FOR RELIEF
### Breach of Implied Contract
### (on behalf of Plaintiffs and the Class)

128.  Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in the preceding paragraphs.

30

129.     QualDerm offered medical services to Plaintiffs and Class Members. Plaintiffs and Class Members accepted QualDerm's services and paid for those services. And when Plaintiffs and Class Members paid for the services, they also provided their Private Information to QualDerm.

130.     Thus, Plaintiffs and Class Members entered implied contracts with QualDerm. Each paid service before and during the Data Breach was made under these mutually agreed-upon implied contracts with QualDerm.

131.     Under those implied contracts, QualDerm agreed to safeguard and protect such information and to timely and accurately notify Plaintiffs and Class Members if their information was compromised or stolen.

132.     Plaintiffs and Class Members would not have provided and entrusted their Private Information to QualDerm in the absence of an implied contract.

133.     QualDerm materially breached the contracts it entered with Plaintiffs and Class Members by:

 a. Failing to safeguard and protect the Private Information of Plaintiffs and Class Members.

 b. Failing to promptly notify Plaintiffs and Class Members of the Data Breach and the subsequent exposure and theft of their Private Information.

 c. Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement.

 d. Failing to ensure the confidentiality and integrity of the electronic Private Information that QualDerm created, maintained, received, and transmitted.

31

134. The damages sustained by Plaintiffs and Class Members as described above were the direct and proximate result of QualDerm's material breaches of its agreements.

135. Plaintiffs and Class Members performed as required under the relevant agreement, or QualDerm's conduct resulted in the waiver of such performance.

136. All contracts include the covenant of good faith and fair dealing. Thus, all contracts impose on each party a duty of good faith and fair dealing. That duty encompasses the following:

    a. The parties must act with honesty in fact in the conduct or transactions concerned.

    b. The parties must act with good faith and fair dealing when executing contracts and discharging performance and other duties according to their terms so as to preserve the spirit, and not merely the letter, of the bargain.

    c. The parties are mutually obligated to comply with both the substance and form of their contracts.

137. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct is justified. Bad faith may be overt or may consist of inaction. And fair dealing may require more than honesty.

138. In this case, QualDerm failed to advise Plaintiffs and Class Members of the Data Breach promptly. In these and other ways, QualDerm violated its duty of good faith and fair dealing.

139. QualDerm, through numerous material breaches of the implied contracts, injured both Plaintiffs and Class Members and sustained actual losses and damages as described above, including that they did not get the benefit of the bargain for which they paid for.

32

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### (on behalf of Plaintiffs and the Class)

140.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in the preceding paragraphs.

141.    This claim is pled in the alternative to Plaintiffs' claim for breach of implied contract.

142.    Plaintiffs and Class Members conferred benefits upon QualDerm in the form of payments. In addition, QualDerm benefitted from receiving Plaintiffs' and Class Members' Private Information and from its ability to retain and use that information. Such data is used to facilitate both payment and the provision of services. For instance, by retaining Plaintiffs' and Class Members' Private Information, QualDerm could offer continued service for a patient visiting more than one time, and not have to ask patients to provide medical history information over and over again. This time saving measure creates additional value for patients and incentivizes them to use QualDerm's services again.

143.    QualDerm also understood and appreciated that Plaintiffs' and Class Members' Private Information was private and confidential and its value depended upon QualDerm maintaining its privacy and confidentiality.

144.    QualDerm appreciated or knew of the benefits that it received. Under principles of equity and good conscience, the Court should not allow QualDerm to retain the full value of these benefits, specifically, Plaintiffs' and Class Members' payments and Private Information.

145.    But for QualDerm's willingness and commitment to maintain its privacy and confidentiality, that Private Information would not have been transferred to and entrusted to QualDerm. Further, if QualDerm had disclosed that its data security measures were inadequate,

33

QualDerm would not have been permitted to continue in operation by regulators and its customers.

146. As a result of QualDerm's wrongful conduct as alleged in this Complaint (including, among things, its knowing failure to employ adequate data security measures, its continued maintenance and use of the Private Information belonging to Plaintiffs and Class Members without having adequate data security measures, and its other conduct facilitating the theft of that Private Information, QualDerm has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and Class Members. QualDerm continues to benefit and profit from its retention and use of the Private Information while its value to Plaintiffs and Class Members has been diminished.

147. QualDerm's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiffs' and Class Members' Private Information, while at the same time failing to maintain that information secure from intrusion and theft by hackers and identity thieves.

148. Under the common law doctrine of unjust enrichment, it is inequitable for QualDerm to be permitted to retain the benefits it received, and is still receiving, without justification, from Plaintiffs and Class Members in an unfair and unconscionable manner. QualDerm's retention of such benefits under circumstances making it inequitable to do so constitutes unjust enrichment.

149. The benefit conferred upon, received, and enjoyed by QualDerm was not conferred officiously or gratuitously, and it would be inequitable and unjust for QualDerm to retain the benefit.

34

150.     QualDerm is therefore liable to Plaintiffs and Class Members for restitution in the amount of the benefit conferred on QualDerm as a result of its wrongful conduct, including specifically the value to QualDerm of the Private Information that was stolen in the Data Breach and the profits QualDerm is receiving from the use of that information.

151.     QualDerm should be compelled to disgorge into a common fund, for the benefit of Plaintiffs and Class Members, all funds that it unlawfully or inequitably QualDerm obtained as a result of its misconduct and the resulting Data Breach.

**FIFTH CLAIM FOR RELIEF**
**Violations of Tennessee Consumer Protection Act**
**Tenn. Code Ann. § 47-18-101, *et seq*.**
**(on behalf of Plaintiffs and the Class)**

152.     Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in the preceding paragraphs.

153.     The Tennessee Consumer Protection Act ("TCPA") was created to protect Tennessee consumers from fraudulent or deceptive business practices.

154.     Plaintiffs and QualDerm are persons under the TCPA.

155.     Tennessee Plaintiffs and Tennessee Class members obtained healthcare or related services from hospitals or clinics serviced by or affiliated with Defendants.

156.     As set forth more fully above, QualDerm caused injury and damages including, inter alia, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of highly sensitive Private Information; deprivation of the value of Private Information; and overpayment for services that did not include adequate data security.

157.     QualDerm concealed and failed to disclose the breach for two months, and in doing so, breached its duties and obligations to remedy the inadequate security and protect its patients whose Private Information was exposed.

158.     QualDerm concealed and failed to disclose in any of its marketing materials, advertising, packaging, and/or any other communication that it lacked sufficient measures in place to safeguard the sensitive data entrusted to it.

159.     QualDerm's conduct constitutes "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce" in Tennessee, making it unlawful under Tenn. Code Ann. § 47-18-104(a).

160.     Under the circumstances herein, QualDerm's failure to disclose that it lacked sufficient and reasonable data security protections constitute fraudulent, deceptive, and unfair business practices.

161.     QualDerm's conduct was fraudulent and deceptive because the omissions created a likelihood of confusion and misunderstanding and had the capacity or tendency to deceive and, in fact, did deceive ordinary consumers, including Plaintiffs and Class Members. Ordinary consumers, including Plaintiffs and Class Members, would have found it material to their conduct had they known that QualDerm lacked sufficient data security measures.

162.     QualDerm owed Plaintiffs and Class Members a duty to disclose these facts because they were known and/or accessible exclusively to QualDerm, which had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because QualDerm actively concealed them and because QualDerm intended for consumers to rely on the omissions in question.

163.     Plaintiffs and Class Members justifiably relied on the material misrepresentations and/or omissions by QualDerm, and reasonable consumers would have been expected to rely upon these omissions, in part, because they are omissions that affect a consumers' Private Information.

164.     QualDerm's conduct actually and proximately caused an ascertainable loss of money or property to Plaintiffs (as set forth above) and Class Members. Absent QualDerm's unfair, deceptive, and/or fraudulent conduct, Plaintiffs and Class Members would have behaved differently and would not have entrusted their most sensitive Private Information to QualDerm.

165.     Accordingly, pursuant to the aforementioned statutes, Plaintiffs and Class Members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Plaintiffs and Class Members are also entitled to recover all available statutory, exemplary, treble, and/or punitive damages, costs of suit, and attorneys' fees based on the amount of time reasonable expended and equitable relief necessary, and all such other relief as the Court deems proper.

### PRAYER FOR RELIEF

WHEREFORE Plaintiffs, individually and on behalf of all others similarly situated, pray for relief as follows:

a.  for an Order certifying the Class as defined herein, and appointing Plaintiffs and their counsel to represent the Class;

b.  for equitable relief enjoining QualDerm from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiffs and Class Members;

37

c. for equitable relief compelling QualDerm to use appropriate cybersecurity methods and policies with respect to Private Information collection, storage, and protection, and to disclose with specificity to Class Members the types of Private Information compromised;

d. for an award of damages, including actual, nominal, consequential, enhanced compensatory, and punitive damages, as allowed by law in an amount to be determined;

e. for an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

f. for prejudgment interest on all amounts awarded; and

g. such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: February 27, 2026                    Respectfully submitted,


_/s/  Russell W. Lewis, IV_
Russell W. Lewis, IV (TN BPR # 024570)
**JOHNSON LAW GROUP**
1019 16th Ave. S.
Nashville, TN 37212
(615) 200-1122
rlewis@johnsonlawgroup.com
*Lic. in AZ, CA, FL, GA, IL, KY, MN, NC, OH, PA, TN only

38

**BAILEY & GLASSER LLP**
Bart D. Cohen (*pro hac vice* forthcoming)
Panida A. Anderson (*pro hac vice* forthcoming)
1055 Thomas Jefferson Street, NW, Suite 540
Washington, DC 20007
(202) 499-1476
bcohen@baileyglasser.com
panderson@baileyglasser.com

*Attorneys for Plaintiffs and the Proposed Class*

39